**Opinion issued July 31, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00550-CV

————————————

**CLAYTON A. HENSLEY, Appellant**

**V.**

**BRYAN W. ALEXANDER AND LARRY L. ALEXANDER, Appellees**

On Appeal from the 61st District Court
Harris County, Texas
Trial Court Case No. 2019-37498

## MEMORANDUM OPINION

Appellees Bryan and Larry Alexander filed suit against Appellant Clayton A. Hensley to collect $250,000 on an unpaid promissory note. The jury found in favor of the Alexanders finding that (1) Hensley signed the promissory note, (2) Hensley ratified the promissory note, and (3) the Alexanders were owners or holders of the

promissory note. In three issues on appeal, Hensley argues there is legally and factually insufficient evidence to support the jury's findings.

We affirm the trial court's judgment.

## Background

### *The Parties' History*

Appellant Clayton Hensley played collegiate baseball at Alvin Community College, where Bryan Alexander was his coach. Larry Alexander is Bryan's father, and Hensley only knew him through Bryan. Hensley did well in collegiate baseball and was eventually drafted by the San Francisco Giants. He played in the major leagues for several years and kept in touch with Bryan during that time. They had shared interests in real estate and hunting.

After retiring from baseball, Hensley started a software company, worked as a baseball analyst, and participated in some real estate deals. He formed Caltex Energy Resources, LLC to try and take advantage of opportunities in the downstream sector of the oil and gas business, particularly the purchase and sale of refined petroleum products.

Bryan, who now worked for 5 Oaks Commodities, reached out to Hensley to discuss potential fuel deals in the European market. Around this time, Hensley hired Renato Corzo as a consultant for Caltex, and he gave him the title of "Director of Project Logistics." Hensley testified that he hired Corzo because Bryan

2

recommended him as someone who could help him with landing trading fuel deals in Europe. Bryan testified that he did not know Corzo personally, but he got Corzo's name from a business associate and passed it along to Hensley.

At some point, Hensley asked Bryan whether he knew anyone who wanted to invest in a fuel tank deal he was doing with a company named Rosneft. Hensley claimed he did not ask Bryan for money personally, but Bryan testified that he did. Hensley planned to use proceeds from promissory notes to pay for fuel-tank storage in Europe, and to then sell the product inside the tanks to customers. Although both Hensley and the Alexanders acknowledge they discussed using promissory notes for fuel-tank storage payments, Hensley testified he did not know that Bryan personally would loan the money, or that he personally would owe the money.

### *The Draft Promissory Note*

On July 17, 2016, Bryan sent an email to Corzo with a cc: to Hensley with the subject line, "FWD: Promissory Note and Cal Tex Agreement." In the email, Bryan stated, "Please find all documents ready for signatures and notary. We look forward to getting all documents returned ready to go tomorrow morning." Attached to the email was a draft promissory note, the first paragraph of which stated:

> For good and valuable consideration received, the sufficiency of which is hereby acknowledged the undersigned, Renato Corzo (in his individual capacity), Clay Hensley (in his individual capacity) and Cal Tex Energy Resources, LLC ("Borrowers"), jointly and severally promise to pay to [Bryan Alexander, Larry Alexander, and Steve M.

Garrett, Sr.[1]] the principal sum of Two Hundred and Fifty Thousand and xx/100 ($250,000.00) plus interest at the lesser rate of ten percent per annum or the highest rate allowed by law, payable in one lump sum in full on or before July 30, 2016.

The draft promissory note was prepopulated with Corzo's and Hensley's electronic signatures, but the Alexanders do not contend that this was the final authorized contract, and the lawsuit is not based upon this document.

The draft promissory note indicated that the note was "payable in one lump sum in full on or before July 30, 2016." Bryan testified that after the draft promissory note was circulated, he and Hensley had discussions about the maturity date. Hensley did not mention anything about the prepopulated signature or signing in his individual capacity. Instead, he told Bryan that he needed more time to get "everything across the finish line."

On July 18, 2016, Hensley sent an email to Corzo and cc'd Bryan with the subject-line "Promissory Note Agreement." In the email, Hensley stated that the documents required certain changes, "as well as the date to the promissory note in which Bryan, Sterlin,[2] and myself have discussed and agreed to." Hensley concluded, "Let's get the wire out first thing in the morning and lets truly get to work

---

[1]  Although Garrett was designated as a lender, the parties agree that he did not sign the promissory note or contribute any portion of the $250,000.

[2]  Sterlin was a business associate of Bryan. He was not party to this lawsuit, nor was he a witness at trial.

4

and start creating stuff together. It's going to be good." When questioned about this email at trial, Hensley agreed that it referenced "a" promissory note, but he testified it was not the same note on which the Alexanders were suing. Hensley testified at trial that the discussions about moving the maturity date of the note "were about something else." Neither during discovery nor at trial did Hensley produce a copy of any draft promissory note or final promissory note other than the one made the basis of the Alexanders' lawsuit—Plaintiff's Exhibit 3.

### *The Promissory Note*

Also on July 18, 2016, Corzo sent an email to Bryan and cc'd Hensley with the subject line "Re: Promissory note." The text stated in all capital letters, "PROMISSORY NOTE EXECUTED. PLEASE NOTE THE WIRING INSTRUCTIONS ARE IN THE INVOICE." The promissory note is similar to the July 17 draft promissory note, except that the maturity date was changed to August 15, 2016, and Corzo's electronic signature was replaced with a "wet" signature. The promissory note states that it was "EXECUTED on the 18th day of July." Hensley's signature was still electronic and not notarized; Corzo's "wet" signature was notarized by a California notary.[3] Both the draft promissory note and the executed note upon which the Alexanders filed suit state that Hensley is signing in his

---

[3]   The jury was charged that Texas law does not require a signature on a promissory note to be notarized.

individual capacity. And typed above his electronic signature on both documents are the words, "In his individual capacity."

Either the day on which the promissory note was executed, or the next day, Bryan spoke to Hensley. According to Bryan, Hensley told him he had "signed [the promissory note] and we're going to go and it is going to be—it's going to be a good ride" and "I've signed it, we've signed it, and we're good to go." Hensley, on the other hand, testified that he notified Bryan during a telephone conversation that he had not executed the promissory note.

At trial and on appeal, Hensley suggests that the copy of the promissory note admitted at trial—Plaintiff's Exhibit 3—is not authentic, pointing to staple marks, color variations, and the background. He also testified at trial that, even though he was copied on the July 18 email transmitting the promissory note, and he acknowledged receiving the email, he did not know what was attached to the July 18 email from Corzo to the Alexanders. Although Hensley acknowledged that Corzo attached something to the email, he testified that "[Corzo] executed something that has nothing to do with me." Hensley acknowledged that "[i]f [the promissory note] was attached to that e-mail, I'm sure I would have seen it, yes."

On August 1, 2016, Hensley sent the Alexanders wiring instructions stating "[p]lease wire funds to Caltex Energy Resources, LLC" and including the bank address and necessary information for Caltex's account with U.S. Bank. According

to the Alexanders, on August 1, 2016, after Hensley told them that he had signed the note, the Alexanders wired the money as required under the terms of the note. Hensley received the money on behalf of Caltex and then wired the money to gas storage facilities in Rotterdam.

### The Aftermath

The August 15 maturity date on the promissory note came and went with no repayment by either Corzo, Hensley, or Caltex, who, according to the terms of the note, were all jointly and severally liable. Then began several months of the Alexanders seeking repayment and Hensley seeking more time to pay.

On August 30, 2016, Bryan sent an email to Hensley and Corzo with the subject line "Promissory note." In the email, Bryan stated, "Knowing that our promissory note was dated for maturity as of August 15, 2016[,] we very much should be regarded more as an ally than a burden." He asked to be "kept in the loop" as the prospective deal progressed. At trial, Hensley pointed to another line of the same email that referred to "our three transactions," suggesting that Bryan's email was not about the promissory note made the basis of this suit, but some other promissory note.

On September 8, 2016, Bryan sent Hensley an email stating in part: "We have a problem I wanted to make you aware of so we can head it off . . . Steve Garrett that loaned a 100K of the money is getting really impatient." He also mentioned that

Garrett "has strong connections with somebody at Interpol." At trial, Bryan admitted that the email was not true because Garrett, though named on the note, had not contributed any of the funds loaned. Bryan testified that by lying to Hensley about Garrett, he had hoped to pressure Hensley into repaying the note.

On September 13, 2017, Larry sent an email to Hensley, with the subject line "$250,000," in which he stated that he gave him "$250,000 in July of 2016" because "Bryan assured me that you were an honest honorable man." Larry explained that he had taken the money out of his retirement account, and that even though Hensley "ha[d] a history" with Bryan, Larry perceived Hensley "as a dishonorable, dishonest person."

On October 6, 2016, Larry sent another email to Hensley "in the hopes that [he would] send [the] $250,000 back to [the Alexanders]." In the email, Larry referenced two of his friends "who make a very good living by litigating against people for contract disputes." He suggested that his friends were "very familiar with [the] business that [Hensley] and [Corzo] were doing," and that he could "send a few letters, file several lawsuits, file several injunctions . . . basically making it impossible for [Hensley] and [Corzo] to continue doing deals . . . ." When questioned about this email at trial, Larry admitted that it was an exaggeration because he was frustrated and desperate to get his money back.

8

On October 17, 2016, Larry sent another email to Hensley with the subject line "Promissory Note Due August 15, 2016," in which he stated:

> Throughout this whole process I have been given promises that a deal was closing in a few days. This has been going on for months. I made the decision to enter the promissory note for $202,000 with you because Bryan trusted you. I want my money wired to me no later than Wednesday, October 19, 2016, or I will be forced to move forward with the legal action to recover my money. I think you and [Corzo] should make plans to borrow the $256,000, and wire it to Bryan and I on Wednesday.

Hensley responded to Larry's email the same day. In an email with the subject line "Re: Promissory Note," he stated in part:

> The promissory notes were given because of the introduction that was made by Bryan and Sterlin expressing that [Corzo] was the guy and can get all of this supply and we would be up and rolling. Furthermore, [Corzo] instructed me to give the promissory notes to get the investors as we would close a deals (sic) prior to the expiration date.

Hensley concluded his response by promising that he was "trying to get a loan for your money to meet your deadline."

The reporter's record from the trial contains 172 pages of text messages exchanged between Hensley and Bryan. In these texts, Bryan repeatedly pleads and threatens legal action against Hensley in an effort to get the note repaid, and Hensley repeatedly promises to do so and asks for more time. The two also blame one another for the failed European gas sales that never came to fruition and the resulting financial burdens that ruined their lives.

9

***The Lawsuit***

The Alexanders sued Hensley, Corzo, and Caltex for breach of the promissory note dated July 18, 2016. They moved for a default judgment, and in September 2019, the trial court signed a default judgment against Caltex. Caltex was severed from the lawsuit on September 16, 2019.

Unable to collect from Caltex, the Alexanders moved forward with the case against Hensley and Corzo. The Alexanders nonsuited Corzo and shortly after, in October 2020, Hensley answered the lawsuit. Hensley's answer did not include a verified denial challenging the authenticity of his signature on the promissory note. It was not until the Alexanders moved for summary judgment that Hensley, on April 5, 2021, filed a verified denial disputing the authenticity of his signature on the note.

The case proceeded to a jury trial. The jury found that Hensley (1) signed the promissory note, (2) ratified the promissory note, and (3) that the Alexanders were the holders of the promissory note. The trial court entered judgment on the jury's verdict awarding the Alexanders $250,000.00 in damages, plus interest, costs and expenses, and attorney's fees.

In three issues on appeal, Hensley challenges the legal and factual sufficiency of the evidence supporting the jury's findings and requesting that we reverse the trial court's judgment.

**Applicable Law and Standard of Review**

In a suit for recovery on a promissory note, a plaintiff need not establish all essential elements for a breach of contract claim. The plaintiff only needs to establish the note in question, that the defendant signed or ratified the note, that the plaintiff is the holder or owner of the note, and that a balance is due and owing. *Roth v. JPMorgan Chase Bank, N.A.*, 439 S.W.3d 508, 512 (Tex. App.—El Paso 2014, no pet.).

In reviewing a legal sufficiency challenge to the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A party bringing a legal sufficiency challenge to a finding on which it did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We may not sustain a legal sufficiency or no-evidence point unless the record demonstrates that (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810 (quoting Robert W. Calvert, "*No Evidence and*

11

*"Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 362–63 (1960)). The factfinder is the sole judge of the witnesses' credibility and the weight to give their testimony. *Id.* at 819.

In reviewing the factual sufficiency of the evidence, we are required to examine all the evidence, and we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Unlike a legal-sufficiency review, a factual-sufficiency review requires that we review the evidence in a neutral light. *Id.*; *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). The factfinder may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see also City of Keller*, 168 S.W.3d at 820–21.

When, as here, a party challenges both the legal and factual sufficiency of the evidence, appellate courts should address the legal sufficiency issues first. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *see* TEX. R. APP. P. 43.3; *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (concluding that appellate courts must first address points that afford greatest relief, that Rule 43.3 "incorporates this principle," and that court "erred by not deciding the rendition issue before the remand issue").

## DISCUSSION

### *Was the promissory note signed by Hensley?*

In his first issue, Hensley contends there is legally and factually insufficient evidence to support the jury's finding that he signed the promissory note. Hensley does not contest that his electronic signature appears on the note. Instead, he argues that he never saw the promissory note in its final form and that he does not know how his electronic signature came to be on it. He argues he would never have signed the note in his individual capacity.

A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation; if the law requires a signature, an electronic signature satisfies the law. TEX. BUS. & COM. CODE § 322.007(b), (d). An electronic signature is attributable to a person if it was the act of the person, which may be "shown in any manner." *See id.* § 322.009(a). The effect of an electronic signature is determined "from the context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law." *Id.* § 322.009(b).

When, as here, a maker challenges the authenticity of his signature in a verified pleading, the burden of proof is on the person claiming validity—the Alexanders—"but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or

13

incompetent at the time of trial of the issue of the issue of validity of the signature." TEX. BUS. & COM. CODE § 3.308(a). Hensley is not dead or incompetent, so his signature is presumed authentic, but the Alexanders still bore the burden of proof at trial.

### *Legal Sufficiency*

Beginning with the presumption of authenticity, we review the evidence in the light most favorable to the jury's finding to determine whether the Alexanders presented more than a scintilla of evidence that Hensley signed the promissory note. *City of Keller*, 168 S.W.3d at 810. Several pieces of evidence are critical.

First, on July 18, 2016, Hensley sent an email to Corzo copying Bryan with the subject line, "Promissory Note Agreement." The email references an "agreement" to change the maturity date on the note and concludes, "Let's get the wire out first thing in the morning and let's truly get to work . . . ." Also on July 18, Corzo sent an email to both Bryan and Hensley that said "promissory note executed," with a copy of the signed promissory note with Hensley's electronic signature attached.[4] Hensley does not dispute receiving this email. And the promissory note attached to the email reflected a changed maturity date of August 15. The jury

---

[4] Though Hensley argues that the promissory note on which he was sued was not the promissory note attached to the July 18 email, for purposes of legal sufficiency review we disregard this assertion. Instead, we address the issue in the factual sufficiency review below.

14

reasonably could have concluded that this change was in accordance with Hensley's prior email requesting a change in the maturity date.

Bryan also testified that on July 18 or July 19, he had a telephone conversation with Hensley, in which Hensley told him he "signed [the note] and we're going to go and it is going to be—it's going to be a good ride" and "I've signed it, we've signed it, and we're good to go." After speaking with Hensley and receiving bank wiring instructions from him, the Alexanders wired $250,000 to Caltex Energy Resources, which accepted the money on Caltex's behalf.

Viewing this evidence in the light most favorable to the jury's finding, and disregarding all other evidence, we conclude there is more than a scintilla of evidence to support the jury's finding that Hensley signed the promissory note. We thus overrule Hensley's legal-sufficiency challenge to the jury's finding that he signed the promissory note.

### Factual Sufficiency

We next consider the evidence in a neutral light to determine whether the jury's finding that Hensley signed the promissory note is against the great weight and preponderance of the evidence. *Cain*, 709 S.W.2d at 176. Hensley contends the evidence is factually insufficient because (1) no one witnessed him signing the note, (2) Corzo's July 18 email "arguably" referenced only his own signature on the promissory note, (3) Bryan's and Larry's testimony is not credible because both

15

admitted lying or exaggerating in their emails to Hensley, (4) Hensley's promises that Bryan and Larry would not lose money is not evidence that he individually signed the promissory note, (5) none of the emails expressly state that Hensley individually signed the promissory note, and (6) Bryan's August 2016 email referencing "three transactions" supports Hensley's argument that his own July 18, 2016 email "may have referred" to another document being signed.

Reviewing each of these contentions, we conclude that the jury's finding that Hensley signed the note is not against the great weight and preponderance of the evidence.

### (1)     No eyewitness saw Hensley sign the note

It is true that no one testified they saw Hensley sign the promissory note, but direct eyewitness testimony of execution is not required. *See State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex. 1991) (stating that any ultimate fact may be proved by circumstantial evidence). For this reason, the jury was instructed that Texas law does not require that signatures on a promissory note be notarized. *See Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 611 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (noting that to prove defendant is maker of note, only his signature on note is required). That no one witnessed Hensley signing the note is thus not conclusive evidence that he did not do so. It was only one factor the jury could consider.

### (2)     Corzo's July 18 email addresses only his own signature

16

In his July 18, 2016 email Corzo states, "PROMISSORY NOTE EXECUTED." Hensley argues that Corzo was referring only to his own signature on the note and not Hensley's. In support, Hensley points to differences between the draft promissory note and the final note that is the basis of this suit. Hensley argues that in the draft promissory note, both Corzo's and Hensley's signatures were prepopulated with electronic signatures, but in the final document, Corzo had replaced his electronic signature with a "wet" signature, which was then notarized. He argues that because his own signature remained the same, Corzo "arguably" was referring only to the fact that he had executed the promissory note, not that Hensley, too, had signed it.

As the Alexanders note, the difference between the draft note and the executed note as it pertains to Corzo's signature is not conclusive evidence that Hensley did not, after reviewing the draft note and obtaining certain requested changes, apply his electronic signature to the note. There is evidence in the record that Hensley had utilized electronic signatures in the past, that one electronic signature was stored on his computer to be used for such situations, and that the electronic signature on the note looked like the electronic signature Hensley had previously used. Again, the difference in the draft note and the executed note created a fact issue for the jury to resolve, which the jury did in the Alexanders' favor.

### (3) Bryan's and Larry's credibility

17

Hensley argues that the Alexanders' testimony is not credible. He points out that Bryan admitted to lying when he tried to use Steve Garrett's name and purported connections to Interpol to pressure Hensley into repaying the loan. He also points out that Larry admitted "exaggerating" when he told Hensley that he had friends that were familiar with Hensley's business and that he would sue and make it impossible for Hensley to continue business.

In our review, we may not engage in credibility determinations. The jury, as the sole fact finder, assesses the credibility of witnesses and may choose to believe all, some, or none of a witness's testimony. *Bufkin v. Bufkin*, 259 S.W.3d 343, 355 (Tex. App.—Dallas 2008, pet. denied); *Miller v. Kendall*, 804 S.W.2d 933, 939 (Tex. App.—Houston [1st Dist.] 1990, no writ). Likewise, the jury may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *McGalliard*, 722 S.W.2d at 697.

We note that both Bryan and Larry readily admitted to the jury that, at times, they were untruthful with Hensley in an effort to pressure him into repaying the note. The jury was entitled to accept their explanation and to believe whichever portions of their testimony it found credible. Bryan testified that Hensley told him that he signed the note; Henley denied that he did so. The jury was entitled to accept Bryan's testimony and reject Hensley's testimony.

### (4) *Hensley's assurances that the Alexanders would be repaid*

Bryan testified that Hensley told him that, no matter what, his money and his dad's money would be safe. Hensley argues that this statement, which he denied making, "is not evidence that [he] individually signed the Promissory Note." We agree that his statement to Bryan is not conclusive proof that he signed the promissory note in his individual capacity. Rather, it is just one more piece of evidence the jury could consider in making its determination, along with the typewritten notation above Hensley's signature on both the draft note and the executed note that he was signing the note "In his individual capacity." The jury was entitled to determine whether it believed Bryan or Hensley, and the jury was also entitled to determine what weight to give their testimony.

### (5)     The post-execution emails referencing a promissory note

Bryan and Larry both wrote post-execution emails in which they referenced a promissory note. Bryan wrote his email on August 30, 2016, and Larry on October 17, 2016. Hensley argues that neither email—though referencing a promissory note—mentions that Hensley signed the note in his individual capacity, and thus, they are not evidence he signed the note individually.

We agree that the emails do not prove conclusively that Hensley signed the note in his individual capacity, but they are circumstantial evidence the jury was entitled to consider in making its final determination. As the Alexanders point out, even though Hensley argued at trial that he never saw the promissory note, he never

19

produced any other promissory note or agreement that he and the Alexanders may have been discussing. The jury could have found Hensley to be not credible when he testified that the repeated references to a promissory note in the emails between the parties was about "something else" or one of "three transactions." And the jury could have believed that Hensley, in fact, executed the note with his electronic signature placed under the typewritten notation "In his individual capacity."

### *(6)*  *"Other" transactions between the parties*

Hensley argues that Bryan's August 2016 email referencing "three transactions" is proof that Hensley's own email on the date of execution "*may* have referred" to some agreement other than the promissory note that is the basis of this suit. But the jury considered that issue and decided that it did not, and it was the jury's province to decide what the parties meant when they repeatedly referred to a promissory note. In finding that Hensley signed the note under the typewritten words "In his individual capacity," the jury necessarily rejected Hensley's argument that the parties' repeated references to a promissory note referred to anything other than the note executed on July 18, 2016, especially given Hensley's inability to produce another document to which the emails purportedly referred.

Considering the evidence in a neutral light, we hold that the jury's finding that Hensley signed the promissory note is not against the great weight and preponderance of the evidence.

20

Having found legally and factually sufficient evidence to support the jury's finding that Hensley signed the promissory note, we overrule Hensley's first issue.

***Was the promissory note ratified by Hensley?***

In his second issue, Hensley contends that there is legally and factually insufficient evidence to support the jury's finding that he ratified the promissory note. Having determined that there was legally and sufficient evidence to support the jury's finding that Hensley signed the note, we need not address whether there is also legally and factually sufficient evidence that he ratified the note.

Signing and ratifying a note are separate methods of establishing contractual liability. *See Coastal Shutters and Insulation, Inc. v. Derr*, 809 S.W.2d 916, 920 (Tex. App.—Houston [14th Dist.] 1991, no writ). Proof that a maker either signed or ratified a contract is sufficient to establish his liability—the holder of the note need not prove both. *See id.*

Because Hensley's second issue is not necessary to the final disposition of this appeal, we need not address it. *See* TEX. R. APP. 47.1.

***Did the Alexanders own or hold the promissory note?***

In his third issue, Hensley contends there is legally and factually insufficient evidence to support the jury's finding that the Alexanders are the owners or holders of the promissory note. Hensley argues that the Alexanders are not holders of the note because they never possessed the original promissory note, and they are not

21

owners of the note because "it was unreasonable for the jury to credit their conclusory testimony about ownership of the promissory note." We reject Hensley's contentions for two reasons.

First, there is no requirement that the Alexanders produce the original note with "wet" signatures to establish they are the holders of the note. In Texas, a plaintiff may establish the existence of a note by producing a photocopy of the promissory note attached to an affidavit in which the affiant swears that the photocopy is a true and correct copy of the original note; no contrary authority requires that a plaintiff produce the original note to enforce it. *See Zarges v. Bevan*, 652 S.W.2d 368, 369 (Tex. 1983) (holding that, in summary-judgment proceeding, photocopy of note attached to affidavit of holder or owner, who swears that it is true and correct copy of note, is sufficient as matter of law to prove owner or holder status, if uncontroverted); *see also Just Fondue It, L.L.C. v. Comerica Bank*, No. 03-08-00066-CV, 2019 WL 1372018, at *2 (Tex. App.—Austin Mar. 27, 2019, no pet.) (mem. op.) (holding in bench trial that, under *Zarges*, original note was not required to establish plaintiff was owner or holder of note because ownership could be proven by affidavit or testimony).

Because this was jury trial and not a summary-judgment proceeding, the Alexanders did not simply submit an affidavit attesting that the promissory note—Plaintiff's Exhibit 3—was a true and correct copy and that they were the holders of

the note. They instead testified at length, and were subject to cross-examination, about the terms of the note, the signatures on the note, and how the note came to be attached to the emails exchanged among the parties. And they also testified that they never assigned or transferred the note to someone else. There was thus legally and factually sufficient evidence to support the jury's finding that the Alexanders were the holders of the note, and the absence of the original note with the "wet" signatures is of no import.

We further note that even if the evidence were legally and factually insufficient to establish that the Alexanders were the holders of the note, the Alexanders could still enforce the note if they established they were the owners of the note. *Leavings v. Mills*, 175 S.W.3d 301, 309–10 (Tex. App.—Houston [1st. Dist.] 2004, no pet.) ("Thus, even if a person is not the holder of a note, he may still be able to prove that he is the owner and entitled to enforce the note . . . ."). There is legally and factually sufficient evidence to support the jury's finding that the Alexanders owned the note. Both Bryan and Larry testified that they owned the promissory note. They also testified that they had never transferred the note and that it had never been repaid.

Nonetheless, Hensley contends that it was "unreasonable" for the jury to give any weight to the Alexanders' testimony, and he again points to evidence that they lied to him in their emails so that he would repay the note. As we have already

discussed, both Bryan and Larry readily admitted to the jury that, at times, they were untruthful with Hensley in an effort to pressure him into repaying the note. The jury was entitled to accept their explanations and to believe whichever portions of their testimony it found credible.

Here, the Alexanders testified that they were the owners of the note admitted into evidence as Plaintiff's Exhibit 3, that Hensley signed the note, and that the balance remained unpaid. In contrast, Hensley testified that he never saw or signed Plaintiff's Exhibit 3. The jury was entitled to accept the Alexanders' testimony and reject Hensley's testimony. *See McGalliard*, 722 S.W.2d at 697.

Given the Alexanders' testimony, the jury's finding that they owned the promissory note is legally sufficient. The credibility issues raised by Hensley do not render the jury's finding that the Alexanders' owned the note to be outweighed by the great weight and preponderance of any contrary evidence.

We thus overrule Hensley's third issue.

## Conclusion

We affirm the trial court's judgment.


                              Veronica Rivas-Molloy
                              Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.